### Nakia ROY and Edward Settles, Appellants,

v.

### UNITED STATES, Appellee.

No. 02–CF–290, 02–CF–306.

District of Columbia Court of Appeals.

Argued May 12, 2004.

Decided April 7, 2005.

Kathleen R. Hartnett, Washington, with whom David W. DeBruin was on the brief, for appellant Roy.

Kenneth H. Rosenau, Washington, appointed by the court, for appellant Settles.

John R. Fisher, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, Alan M. Boyd, Lynn C. Holliday and Patricia A. Heffernan, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and WASHINGTON, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

At the conclusion of a jury trial, appellants were convicted on several counts, stemming from the events of June 12, 2000, in which appellants Roy and Settles opened fire on one another on a public street, resulting in the death of an inno-

cent bystander, Grace Edwards. Appellant Settles was convicted of second-degree murder (D.C.Code §§ 22–2403, –3202 (1981)), two counts of assault with a dangerous weapon (ADW) (D.C.Code § 22–502 (1981)), one count of possession of a firearm during the commission of a crime of violence (PFDCV) (D.C.Code § 22–3204(b) (1981)), and carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a) (1981)). Appellant Roy was also convicted of second-degree murder (D.C.Code §§ 22–2403, –3203 (1981)), four counts of ADW, five counts of PFDCV (D.C.Code § 22–3204(b)(1981)), one count of CPWL (D.C.Code § 22–3204(a) (1981)), and one count of simple assault (D.C.Code § 22–504 (1981)). Both appellants timely noted appeals of these convictions, asserting error as to severance of the defendants, the jury instructions on causation, exclusion of evidence and merger of multiple PFDCV and ADW convictions. We affirm all of the convictions with the exception of appellant Roy's multiple PFDCV convictions.

## I.

We set forth here a general overview of the facts of this case. Those more detailed facts which may be relevant to a specific issue will be presented more fully in the subsections addressing those issues.

The appellants had a common acquaintance in Nacheta Harris. Harris had been Roy's girlfriend and is the mother of his child. Upon her break up with Roy, Harris began dating Settles. On the fateful morning, Harris and Settles arrived at her cousin's house on Valley Avenue. Settles had his motorcycle. Roy was waiting in the alley behind Valley Avenue for Harris and Settles and began running toward them. Settles, seeing Roy, dropped his motorcycle and began running away. Roy stopped where Harris was standing, punched her in the face, then ran after Settles, firing three or four shots from his gun. Settles did not return gunfire, but rather was able to escape. Roy gave up the chase at that point, returned to Harris, who he again punched in the face, and then went to a field leading to Tenth Place.

Settles, after running from Roy, arrived on Valley Avenue and met Ralph Faulkner who was sitting on his porch. Settles told Faulkner what had happened and asked him if he would retrieve his motorcycle and cell phone from the alley. Faulkner went to the cycle and saw a man, matching Roy's description, standing in the field across the street from the alley, watching him. He dropped the motorcycle and returned to his apartment. From his apartment building he could still see Roy. He was then standing near the footbridge to Tenth Place.

Settles proceeded to the apartment of a friend, Andre Brown, who was keeping Settles' gun under a mattress in the apartment. Brown retrieved the gun and gave it to Settles who left the apartment, calling for Brown to come with him. Outside, another friend, Bernard James, was encountered. Settles asked Brown to drive him to Tenth Place, which he did, accompanied also by James. Settles was in the front passenger seat with the window down and his gun in his lap when the car entered Tenth Place.

As the car entered Tenth Place, another witness, Charles Reeves, was sitting on the porch of his apartment building[1] and Grace Edwards was taking her morning walk. Some evidence reflected that Roy then came up out of a nearby stairwell, pointing a gun at the car. Settles fired

1. In addition to Mr. Reeves, two other witnesses, Minnie Mae Fuller and Marjorie Bowles witnessed the events and testified to their observations.

three shots at Roy, who returned fire with several shots of his own. Witness Reeves had already run inside his building as the car continued up Tenth Place. Grace Edwards screamed and fell to the ground having been fatally hit by a stray bullet.

Having missed Roy, Settles told Brown to circle around, but while doing so, Brown noticed two police officers, in an unmarked car, driving behind him. Accordingly, instead of driving back to Tenth Place, Brown parked the car on Valley Avenue and the three men entered Brown's apartment building. Approximately five minutes elapsed from the time the men left for Tenth Place and the time they returned to the apartment.

Meanwhile, the officer had noticed Brown and the other men in the vehicle as well, and was about to check the car's tags in the computer, when he received a call for the shooting on Tenth Place. Upon his arrival on Tenth Place, he heard someone say that shots had been fired from a four-door Dodge Intrepid with three occupants. He broadcast a lookout for the vehicle he had previously seen. The car was later located parked on Valley Avenue. Ballistics evidence recovered from the scene showed that two guns were fired on Tenth Place, a 9 mm semiautomatic and a .380 caliber firearm.

## II.

Both appellants challenge their convictions on a number of grounds. Some of the arguments are identical for both appellants, some are merely related and finally some are unique to one appellant or the other. We begin our analysis with the issue of severance.

### A. Severance of Defendants

██ We review the trial court's denial of appellants' motions to sever for abuse of discretion and will reverse only upon appellants' showing that they suffered manifest prejudice by being tried jointly. *Dancy v. United States,* 745 A.2d 259, 266 (D.C.2000). Such prejudice may not be established *per se* because two defendants blame one another for the offense charged. *Id.* at 266; *Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Rather, appellants "must demonstrate that there is 'a danger or risk that the jury will draw an improper conclusion from the existence of the conflicting defenses alone that both defendants are guilty." ' *Dancy,* 745 A.2d at 266 (quoting *Garris v. United States,* 559 A.2d 323, 329 (D.C.1989)).

Appellant Settles argues that the trial judge abused his discretion when he denied several written and oral motions to sever, filed or made both before and during trial. In support of his argument, he cites to several parts of the trial transcript, in which he argues he was prejudiced by the joinder of his case with appellant Roy: (1) the impairment of his ability to put on a case of self-defense by the court's admission, of evidence in direct contradiction of self-defense; (2) the exclusion of identification evidence, through witness Marjorie Bowles; and (3) a discussion in "open court" regarding the ability of appellant Roy to cross-examine witness Andre Brown about drug dealing that also included Settles.[2]

Roy contends that he was prejudiced when: (1) Settles's attorney was permitted

---

**2.** Following this contention, Settles also argues that "[i]nstances such as the one elaborated above occurred throughout the trial (see appendix) creating significant concern for the fairness thereof." The only support of this statement is the attachment of several redact-

ed transcript sections. Aside from arguing "concern," no factual support or argument is provided by Settles in support of this statement. Thus while we might treat it as abandoned, *Bardoff v. United States,* 628 A.2d 86,

to act as a second prosecutor, in light of the defendant's irreconcilable defenses, and (2) several out-of-court statements of Settles were admitted without the opportunity for cross-examination in violation of the confrontation clause.

Both appellants contend that absent this aforementioned evidence, admitted or precluded as a result of the joint trial, the government's cases against them were weak and therefore the failure of the court to sever the two cases created a trial in which there was a "danger or risk that the jury w[ould] draw an improper conclusion from the existence of the conflicting defenses alone that both defendants [were] guilty." *Dancy*, 745 A.2d at 266 (quoting *Garris*, 559 A.2d at 329). We must disagree.

 The mere fact that two co-defendants' defenses are separate, distinct and antagonistic and that each may have a better chance at acquittal if tried separately is not sufficient for a grant of severance. *Simcic v. United States*, 86 A.2d 98, 102 (D.C.), *aff'd*, 91 U.S.App. D.C. 102, 198 F.2d 951 (1952). Policy concerns have long favored joint trials. Thus, the more rigorous requirement of manifest prejudice must be established. *Dancy*, 745 A.2d at 266. Neither Settles nor Roy is able to meet this burden.

 Settles contends that he was "restrained significantly" in his ability to put on a case of self defense because Roy "put on affirmative evidence to attack that theory on direct examination." He does not

state specifically what evidence it was that restrained his ability to put on his defense, and in fact, he did put on a defense. Thus he is unable to show the requisite degree of prejudice on that ground. Next, Settles challenges the refusal to admit testimony that Marjorie Bowles had seen Roy with guns on two prior occasions. This evidence was considered by the trial court and found to be more prejudicial to Roy than probative to Settles. Ms. Bowles had already provided unchallenged testimony that she saw Roy, shortly after hearing gunshots on the morning of the offense in question. She further testified that she had seen Roy almost every day for a couple of years, thus leaving little room for question regarding her identification. Accordingly, the trial court's refusal to admit Settles' additional proffered identification evidence, as unduly prejudicial toward Roy, did not result in manifest prejudice to Settles.

 Finally, Settles' contention that he was prejudiced by a discussion in "open court" about whether Roy could cross-examine Andre Brown about his drug dealing activities, which happened to include Settles, was in error. It is clear from the transcript that this discussion took place during a bench conference, outside the presence of the jury and, therefore, resulted in no prejudice to Settles.[3] We find no resulting prejudice to Settles in the admission or preclusion of the preceding evidentiary matters; thus, it is unnecessary to determine whether absent that evidence

90 n. 8 (D.C.1993), we find no manifest prejudice attending these "[i]nstances."

3. In addition, Settles also challenges the trial court's denial of a mistrial on these same grounds. During this bench conference the trial judge ruled that Settles had opened the door to questioning about Brown's and Settles's drug activities and thereby permitted Roy to continue his cross-examination of Brown. During cross-examination, Roy's

counsel elicited that Settles had provided marijuana to Brown. The government, but not Settles, objected at that time, however, a few minutes later Settles made a motion for a mistrial. The trial court denied the motion and Settles now challenges that ruling.

The determination whether to grant or deny a mistrial is within the broad discretion of the trial court and our review of such a determination is deferential. *Gordon v. United States*, 783 A.2d 575, 583 (D.C.2001). We will only

the government's evidence would have been sufficient to justify the jury's determination. We find no abuse of discretion in the trial judge's denial of Settles' motions for severance.

 Roy's severance challenge also fails to establish manifest prejudice as a result of the joint trial. Roy's arguments that severance should have been granted because of irreconcilable defenses and the resulting "second prosecutor" role taken on by Settles' counsel, fail to establish error, and certainly do not establish manifest prejudice. *Simcic*, 86 A.2d at 102.

 With regard to his confrontation clause argument, we are similarly unable to find manifest prejudice. Roy sets forth five different out-of-court statements, made by Settles, which he contends would have been inadmissible against him in a separate trial. He presents argument, however, on only one of these statements: "[t]here that nigger go right there."[4] This statement was admitted as a present sense impression exception to the hearsay rule.[5] It was made when no police were present and hardly with Settles' anticipation of testimony at trial. Roy does not challenge independently the admissibility of this statement as a present sense im-

pression, merely that the statement undermined his defense and violated his right to confrontation. This argument is unpersuasive. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) held that when testimonial statements to police are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation. *Id.* at 1374. The statement here was not "testimonial" within the meaning of *Crawford* because it was not made to the police for purposes of accusation or prosecution; it was simply a present sense impression statement that Settles made to his fellow passengers, and hence its admission did not pose a Confrontation Clause issue under the *Crawford* holding. Because the statement would likely have been admissible, even in a separate trial, no manifest prejudice resulted from the failure of the trial court to severe Roy's case from Settles' case on that ground.

**B. Trial Court's Causation Instructions on Second–Degree Murder for both Settles and Roy**

1. *Factual and Procedural Background*

 Prior to trial, a joint pre-trial hearing was held, at which the government

---

reverse the denial of a motion for a mistrial "if the decision appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Parker v. United States*, 757 A.2d 1280, 1286 (D.C.2000). Prior to trial, the judge ruled that evidence of Settles' drug-dealing with Brown would be precluded from the government's case-in-chief but told the parties that if Settles opened the door, then the evidence would be permitted. During Settles' cross-examination of Brown, he questioned Brown as to the drug related reason he had Settles' gun in his apartment thus opening the door to questioning regarding the gun and its relation to prior drug activities involving both Brown and Settles. "[A] defendant cannot well complain of being prejudiced by a situation which [he] created." *Id.* at 1286–87 (citation omit-

ted). In any event, the testimony was minimal in the context of a month long trial. We find the trial judge's ruling rational and reasonable and see no miscarriage of justice in his denial of Settles' motion for a mistrial.

4. Because no argument was presented with regard to the other four statements raised by Roy, we might refuse to consider them; *see Bardoff, supra* note 2, 628 A.2d at 90 n. 8; but in any event, we find no justification for upsetting the joint trial.

5. Present sense impressions have been recognized as possess[ing] a degree of spontaneity which is the foundation of their trustworthiness. *Hallums v. United States*, 841 A.2d 1270, 1276–78 (D.C.2004). As such, they leave little room for fabrication. *Id.*

submitted a memorandum of law setting forth their theories of liability for both Settles and Roy. That memorandum set forth the government's theory that Settles was guilty under a gun-battle theory of liability, while it presented alternative theories with regard to Roy. The government's primary theory of liability for Roy was that he was guilty of the first-degree murder of Ms. Edwards under a transferred intent theory. As an alternative theory, however, the government argued that Roy too was liable under a "depraved heart murder theory," [6] for his participation in the gun battle on a public street. At the close of the hearing, the judge ruled that it did not matter which appellant started the gun battle or which bullet actually killed Ms. Edwards but rather that the appellants' actions:

> [D]emonstrated conscious disregard of the safety of citizens in the District of Columbia when they sought to kill each other, and that there would have been ... no murder of an innocent person but for the willingness of both Mr. Roy and Mr. Settles to turn city streets into an urban battle ground.

At the close of trial, the parties discussed the language of the causation instructions which would be given to the jury. The government contended that the instructions should require the jury to find that Settles and Roy were "armed and prepared" to engage in a gun battle and that they, in fact, did engage in a gun battle. Settles argued that the jury should be required to find that Settles "agreed, either explicitly or tacitly, to engage in mutual combat involving firearms" or " 'to engage in a gun battle,' " contending that the language offered by the government required a "one-sided" action, instead of a mutual agreement. The court opted for the "armed and prepared" language stating "in my view, there's not much difference, if any at all, in terms of ... if one is armed and prepared to engage in a gun battle versus a tacit agreement to engage in a gun battle."

Roy then contended that the causation instructions applied only to Settles, and that the court, so as to avoid confusion, should so instruct the jury.[7] The court initially agreed that it would not give the causation instructions with regard to Roy. However, after further discussions, the court stated that the legal principles involved in the causation instructions applied to Roy as well as Settles and that since evidence had been presented which may lead the jury to conclude that Roy was involved in the battle but not responsible for the fatal shot, the instructions should be given for both Settles and Roy.[8]

---

**6.** This is also expressed at common law as a "wanton recklessness" to constitute common-law second-degree murder. *Banks v. State,* 92 Md.App. 422, 443 n. 5, 608 A.2d 1249, 1259 n. 5 (1992); *Cirincione v. State,* 75 Md. App. 166, 171 n. 1, 540 A.2d 1151, 1154 n. 1 (1988); *State v. Iovino,* 524 A.2d 556, 558 (R.I.1987).

**7.** The government had proceeded through the entire trial, including closing argument, under the theory that Roy was responsible for the fatal shot and that he could be found guilty of first-degree murder as a result. It was only as an alternative theory that he was at least guilty of second-degree murder for his participation in the gun battle, regardless of whether he fired the fatal shot.

**8.** The instruction on causation, under the lesser included offense of second-degree murder, finally given to the jury stated:

> A person causes the death of another person if his actions are a substantial factor in bringing about the death and if death is a reasonably foreseeable consequence of his actions. Death is reasonably foreseeable if it is something which should have been foreseen as reasonably related to the defendant's actions.
>
> It is not necessary for the government to prove that a defendant personally fired the

## 2. *Analysis*

 Both Settles and Roy challenge the trial court's instructions on causation, contending that it mischaracterizes the law of homicide liability in the District of Columbia.[9] We review the instruction given for its compatibility with the law. *United States v. DeFries*, 327 U.S.App. D.C. 181, 191–92, 129 F.3d 1293, 1303–04 (1997); *see (Deon) Russell v. United States*, 701 A.2d 1093, 1099–1100 (D.C.1997).

We think it important to note that while proximate causation as a theory of second-degree murder liability has been recognized in our case law for some time, the factual scenario of a "gun battle" on city streets, as in this case, is relatively new. While urban gun battles years ago in-

volved revolvers or clipped pistols of limited fire power, they have now escalated to the use of automatic and semiautomatic weapons. The results are pocket wars with no rules of engagement resulting in a highly increased risk to noncombatants. It is this increased risk to innocent bystanders which justifies the application of proximate cause liability to those participants who willfully choose to engage in these battles.[10]

 In this jurisdiction we have held findings of homicide liability permissible where: (1) a defendant's actions contribute substantially to or are a substantial factor in a fatal injury; *Baylor v. United States*, 407 A.2d 664, 669–70 (D.C.1979); and (2) the death is a reasonable foreseeable con-

---

fatal round in this case. Rather, if you are convinced beyond a reasonable doubt that: One, the defendant was armed and prepared to engage in a gun battle; Two, that the defendant did, in fact, engage in a gun battle on the 3400 block of Tenth Place, Southeast on June 12, 2000; Three, that the defendant did not act in self-defense, as I will describe that concept to you, at the time he participated in a gun battle; Four, that the defendant's conduct on Tenth Place on June 12th, 2000 was a substantial factor in the death of Grace Edwards; and Five, that it was reasonably foreseeable that death or serious bodily injury to innocent bystanders could occur as a result of the defendant's conduct on Tenth Place on June 12th, then, as a matter of law, the defendant is deemed to have caused the death of Grace Edwards.

The government must prove causation beyond a reasonable doubt.

Now, the second element, ladies and gentlemen, is:

Two, that at the time the defendant did so, he had the specific intent to kill or seriously injure the decedent, or acted in a conscious disregard of an extreme risk of death or serious bodily injury to the decedent;

Three, there were no mitigating circumstances....

Four, that he did not act in self-defense [.]
...

**9.** Settles also curiously claims, for the first time on appeal, that the trial judge should have given an instruction on conspiracy. Settles was not indicted for conspiracy and we find no error in the trial court's failing to *sua sponte* instruct the jury on conspiracy.

**10.** Other jurisdictions have extended proximate cause liability to participants in gun battles, finding that an individual's participation in such a battle represents a depraved indifference to human life such that he or she meets the *mens rea* for second-degree depraved heart murder. Further, courts have determined that the combined hail of bullets that result from such a battle are jointly responsible for the fatal injury, such that a determination of which defendant's bullet "actually" caused the death is unnecessary. Finally, courts have found that a death which results from the shower of bullets created during this type of battle is more than reasonably foreseeable, *i.e.*, conscious awareness of danger. *Alston v. State*, 101 Md.App. 47, 643 A.2d 468, 469 (1994), *aff'd*, 339 Md. 306, 662 A.2d 247 (1995); *Commonwealth v. Santiago*, 425 Mass. 491, 681 N.E.2d 1205, 1215 (1997); *People v. Sanchez*, 26 Cal.4th 834, 111 Cal. Rptr.2d 129, 29 P.3d 209 (2001); *State v. Brown*, 589 N.W.2d 69 (Iowa App.1998), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001); *Phillips v. Commonwealth*, 17 S.W.3d 870, 873–75 (Ky.2000).

sequence of the defendant's actions.[11] *McKinnon, supra* note 11, 550 A.2d at 918. We have defined substantial cause as that conduct which a reasonable person would regard as having produced the fatal effect. *Butts v. United States,* 822 A.2d 407, 417 (D.C.2003). Thus, we hold defendants criminally accountable for, "all harms that are reasonably foreseeable consequences of his or her actions." *McKinnon, supra* note 11, 550 A.2d at 918; Criminal Jury Instructions for the District of Columbia, No. 4.26 (4th ed.1993).

 We conclude that concentration on an "agreement," as did Roy, would cause instructional difficulty and jury confusion. Roy cites no case, persuasive or binding, which has held that a requirement of an agreement (express or tacit) must, by a jury instruction, be found for conviction. Indeed, the term when used in the cases he has cited, is a characterization by the appellate court of the record facts, not an instructional holding.[12] While in a conspiracy prosecution, the term "agreement" has long been used and understood, at least by the courts and lawyers in jury charges, that term in an armed, heated, street engagement is not so easy of understanding, to say nothing of interpretation. Street combatants seldom, if ever, reach a meeting of the minds to do battle. A "tacit agreement" while understood by judges and lawyers is too amorphous and bereft of clear meaning to be practical for a jury instruction. It is sufficiently so as not to be the stuff by which to reverse this conviction. We think the concept of "concurrent or mutual expectation" of armed violence more meaningfully describes previous adversaries who have armed themselves and face off in a "High Noon" shoot out. In the present case, the evidence is quite susceptible of an inference that before the first shot was fired, Roy and Settles both had expected to engage in the street gun battle where injury or death to the innocent was foreseeable. Roy had remained in the area, no doubt at least partially concealed in the stairwell, with an expectation that Settles would return, which the jury permissibly could and did infer under the instructions given. When they met again, and Roy approached the car pointing his gun at Settles, their mutual expectation and joint preparation matured into the shoot-out. Since Roy's self-defense claim was rejected by the jury, it per force concluded that Roy was present in the area armed, prepared, and expecting to do battle. We hold that the trial court did not err in declining to give Roy's requested "agreement" instruction. The instructions as given were the functional equivalent of asking the jury to decide whether there was a concurrent or mutual expectation that a street battle would ensue. Accordingly, we hold there was no error in the instructions given.[13]

---

11. Appellant Roy contends that this theory of homicide liability is "novel," not one of the "time-tested theories" and that it is, therefore, improper. This argument is in error. We have long recognized proximate causation as a valid theory of second-degree murder liability. *See Comber v. United States,* 584 A.2d 26, 38–39 (D.C.1990) (en banc); *McKinnon v. United States,* 550 A.2d 915, 917–18 (D.C. 1988); *see also Simcic,* 86 A.2d at 103 (negligent homicide by two drivers).

12. *See, e.g., Sanchez, supra* note 10, 26 Cal.4th at 849, 111 Cal.Rptr.2d 129, 29 P.3d 209;

*Pettigrew v. State,* 999 S.W.2d 810, 813 (Tex. App.—Tyler 1999); *People v. Russell,* 91 N.Y.2d 280, 670 N.Y.S.2d 166, 693 N.E.2d 193, 195 (1998); *People v. Daniels,* 172 Mich. App. 374, 431 N.W.2d 846, 848, 852 (1988); *Commonwealth v. Santiago, supra* note 10, 681 N.E.2d at 1214–15; *Alston, supra* note 10, 662 A.2d at 254.

13. Appellant Roy contends that the issuance of the causation instruction in his case represented a constructive amendment or variance to his indictment. Roy was charged by indictment with first-degree murder. As such,

While the evidence was unclear as to whether Roy's or Settles' bullet was responsible for the fatal shot, such a determination is unnecessary if both men prepared for and undertook to participate in the gun battle where it was clearly foreseeable that others would be endangered. Our dissenting colleague as to this point would have the court view what happened on Valley Avenue separately from the events on Tenth Place. He concludes that the first shots fired by Roy on Valley Avenue are of no relevance because "there was a hiatus between the two encounters." (*Dissent* at note 1.) But the first of the two encounters is highly revealing of Roy's earlier and continuing intent to shoot Settles. When Roy emerged from the stairwell pointing his gun at Settles who had arrived after quickly arming himself, it was no separate event from the first. It was a continuum of Roy's desire to shoot Settles and scarcely constituted a break in the altercation.

In addition, we do not read the jury instruction as treating the Valley Avenue shooting as separate from the altercation as a whole. The instruction, of necessity, had to relate to the Tenth Street site since that was where the death occurred. The change of the location in the brief period did not interrupt the continuity of the events.

## C. Preclusion of Cross–Examination Regarding Mental Health of Minnie Mae Fuller

Appellant Roy contends that the trial court erred when it precluded his cross-examination of government witness Minnie Mae Fuller regarding her prior history of mental illness. Ms. Fuller's mental health records had been disclosed to Roy prior to trial and revealed that she had on different occasions in the past been diagnosed with manic depression, schizophrenia, episodic alcohol abuse and dysthymia. The most recent records regarding these diagnoses were from January of 1986, some 14 years before the murder. There was no indication that she recently suffered from a mental illness or was taking medication for the treatment of a mental illness. The trial judge held that Roy had failed to set forth any basis for believing that Ms. Fuller's mental health history was relevant to her testimony, her statements to the police or the grand jury or her ability to observe or recall events. He further ruled that the records from 1986 were too remote and "lack[ed][ ] connection," so he precluded Roy's cross-examination on that issue. Roy further requested an opportunity to voir dire Ms. Fuller about whether she was currently taking any medication but that request was also denied by the trial judge.

The "regulation of the extent and scope of cross-examination lies with the discretion of the trial judge" who "may always limit cross-examination ... to prevent inquiry into matters having little relevance or probative value to the issues raised at trial without committing error." *Williams v. United States,* 805 A.2d 919, 927 (D.C.2002) (internal quotation omit-

---

he was placed on notice that the government may request and that the jury may be able to consider charges of a lesser included offense, in this case second-degree depraved heart murder. *Woodard v. United States,* 738 A.2d 254, 259 n. 10 (D.C.1999). Throughout the trial, the government proceeded under the theory that Roy and Settles participated in the gun battle that resulted in Ms. Edwards'

death. Roy's indictment stated that he killed Ms. Edwards by shooting at Settles, James and Brown. Accordingly we cannot conclude that the events upon which the jury rendered its verdict were " 'distinctly different' from the facts alleged by the grand jury." *Carter v. United States,* 826 A.2d 300, 306 (D.C.2003). We find no error.

ted). In order to delve into a witness's mental health history on cross-examination, it must be required in the interest of justice. *Velasquez v. United States,* 801 A.2d 72, 79 (D.C.), *cert. denied,* 537 U.S. 963, 123 S.Ct. 396, 154 L.Ed.2d 319 (2002) (citing *United States v. Lopez,* 611 F.2d 44, 45 (4th Cir.1979)).

The last record of a mental health disturbance suffered by Ms. Fuller occurred a decade and a half prior to her testimony in this case. The trial judge had the opportunity to observe Ms. Fuller testify and concluded that her testimony was "completely competent." Roy proffered no evidence to rebut Ms. Fuller's competency but rather argued that his lay understanding was that illnesses of the type she had been diagnosed with didn't "just sort of [go] away." In light of the evidence stated above, we find no abuse of discretion in the trial judge's preclusion of Roy's cross-examination into Ms. Fuller's mental health history.

### D. Merger

Appellant Roy argues that two of his three ADW convictions and three of his four PFDCV convictions merge and thus should be vacated. We review issues of merger *"de novo,* to determine whether there has been a violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States." *Nixon v. United States,* 730 A.2d 145, 151–52 (D.C.1999).

Where a defendant has reason to know that his or her intended target is not alone and fires multiple shots in their direction, multiple convictions for ADW are permitted. *James v. United States,* 718 A.2d 1083, 1087 (D.C.1998) (citing *Ruffin v. United States,* 642 A.2d 1288, 1296 (D.C.1994)). Roy was convicted of three counts of ADW for firing multiple shots into the vehicle which carried Settles,

Brown and James. Evidence was presented that the windows of the car were not tinted and that all three men were sitting upright when they drove past Roy. Settles shot at Roy from the passenger seat as the car moved up Tenth Place, rendering it obvious that at least one other person was in the car, the driver. Finally, this offense occurred in early daylight so that it was more than reasonable for the jury to conclude that Roy knew those people were in the car when he fired his weapon at those occupants. Accordingly, these convictions do not merge.

As to the issue of whether multiple PFDCV convictions merge, this court has held that it was not the intent of the legislature to allow multiple PFDCV convictions based on a single possession of a single weapon during a violent act. *Nixon, supra,* 730 A.2d at 153. Therefore, we conclude that Roy's PFDCV convictions do merge and that three of Roy's PFDCV convictions merge leaving one such conviction.

### III.

Accordingly, the judgments of convictions of Settles and Roy are affirmed except as to the multiple PFDCV convictions of Roy. Those judgments are remanded with directions to vacate all but one of them and to re-sentence as appropriate.

*So ordered.*

GLICKMAN, Associate Judge, concurring in part and dissenting in part:

I agree that a defendant who unlawfully participated in a gun battle may be found guilty of murder if a stray bullet killed an innocent bystander, regardless of which combatant actually fired the fatal shot. So long as the defendant entered the fray *before* that shot was fired, the question of proximate causation—whether the harm

was a reasonably foreseeable consequence of the defendant's acts, *see McKinnon v. United States*, 550 A.2d 915, 918 (D.C. 1988)—poses no great conceptual difficulty. "By choosing to engage in a shootout, a defendant may be the cause of a shooting by either side because the death of a bystander is a natural result of a shootout, and the shootout could not occur without participation from both sides." *Commonwealth v. Santiago*, 425 Mass. 491, 681 N.E.2d 1205, 1215 (1997). Where two or more persons "voluntarily and jointly created a zone of danger," it is fair to hold each one "responsible for his own acts and the acts of the others" that ensued. *People v. Russell*, 91 N.Y.2d 280, 670 N.Y.S.2d 166, 693 N.E.2d 193, 195 (1998). As "[t]he deadly homicidal force . . . was a collective hail of bullets, a collective fusillade," *Alston v. State*, 101 Md.App. 47, 643 A.2d 468, 469 (1994), *aff'd*, 339 Md. 306, 662 A.2d 247 (1995), the responsibility may be collective as well.

It is a different matter if the defendant did not join the combat until *after* the bystander was killed. In that case, the victim's death could not have been a consequence of the defendant's subsequent actions even if the defendant wholeheartedly and unjustifiably perpetuated the gun battle. The defendant's actions after the bystander was shot have no causal relationship to the previous stray bullets, and therefore such a defendant cannot be held criminally liable under the gun battle theory for the bystander's injuries. This principle is analogous to the rules that an accessory after the fact is not guilty of the substantive crime previously committed by the principal, *see, e.g., Williams v. United*

*States*, 478 A.2d 1101, 1106 (D.C.1984), and that a member of a criminal conspiracy is not liable for crimes committed in furtherance of the conspiracy before he joined it, *see, e.g., United States v. Goldberg*, 105 F.3d 770, 775–76 (1st Cir.1997).

In light of these considerations, the application of the gun battle theory of causation in the present case to appellant Roy was problematic. At trial, there was no dispute that it was appellant Settles, not Roy, who started the shooting on Tenth Place. Settles fired a volley of shots at Roy before Roy fired back. There also was no dispute that the errant bullet that struck and killed Grace Edwards may have come from Settles' opening volley. Thus, Ms. Edwards may have been killed before Roy joined in the gun battle that resulted in her death. The critical causation question, therefore, was whether Roy intentionally provoked or was otherwise responsible for Settles' opening volley—whether, in other words, the shootout was a jointly created affair from the outset.

The answer to this question was in doubt. On the one hand, as my colleagues correctly observe, the evidence was "susceptible of an inference that before the first shot was fired, Roy and Settles both had expected to engage in the street gun battle" and met on Tenth Place with that shared purpose in mind. *Ante* at 508. There even was testimony that Roy emerged from an apparent hiding place in a stairwell on Tenth Place and began the battle by pointing his gun at Settles.[1] On the other hand, however, this evidence was contested, and the jury may have doubted it. The jury permissibly could have enter-

---

1. It should be noted that, as the trial court instructed and the government agrees, Roy's liability for the murder depended on whether Ms. Edwards' death was the result of his conduct *on Tenth Place*. The homicide cannot be viewed as the proximate consequence

of Roy's earlier initiation of hostilities on Valley Avenue, because even though Settles was seeking revenge for Roy's attack on him there, there was a hiatus between the two encounters.

tained the possibility that Roy did not voluntarily meet Settles on Tenth Place for a battle and did nothing there to encourage Settles's opening salvo.

The gun battle causation instruction was deficient, in my view, because it did not clearly require the jury to distinguish between these alternatives and find that Roy shared responsibility for the start of the shootout. The instruction did require the jury to find that Roy's "conduct on Tenth Place ... was a substantial factor in the death of Grace Edwards" and that it was reasonably foreseeable that her death would occur "as a result of the defendant's conduct on Tenth Place," but these were vague generalities. What gave specific content to them was the balance of the instruction, which required the jury to find only that Roy was "armed and prepared" to engage in a gun battle, that he did "engage" in such a battle, and that he did not act in self-defense. My colleagues conclude that this language was "the functional equivalent of asking the jury to decide whether there was a concurrent or mutual expectation that a street battle would ensue." *Ante* at 508. With respect, I cannot

agree. Findings that Roy was "armed and prepared" to do battle in the event that he was attacked and that he did not act in justified self-defense when he returned Settles' fire as Settles drove away fall short of signifying that Roy purposely met Settles for a battle on Tenth Place or that he instigated the shooting that Settles began there.[2]

Because I conclude that the causation instruction allowed the jury to find Roy guilty of murder even if it was Settles who shot Ms. Edwards without finding that Roy had already joined in the combat or had provoked Settles to shoot—i.e., without finding that Roy did anything that proximately caused the fatal shot—I respectfully dissent from my colleagues' decision to affirm Roy's second degree murder conviction.

---

2. The trial court rejected a proffered causation instruction that would have required the jury to find that the defendants "agreed, either explicitly or tacitly," to engage in the gun battle. Such an instruction, which would have addressed the deficiency I perceive, has been given in other gun battle murder cases in Superior Court, and it finds support in cases from other jurisdictions. Compare, for example, the following instruction approved by the New York Court of Appeals:

If you find that the People have proven beyond a reasonable doubt that defendants *took up each other's challenge,* shared in the venture and unjustifiably, voluntarily and jointly created a zone of danger, then each is responsible for his own acts and the acts of the others ... and it makes no difference whether it was a bullet from Mr. Bekka's gun, Mr. Russell's gun or Mr. Burrough's

gun that penetrated Mr. Daly and caused his death.

*Russell,* 670 N.Y.S.2d 166, 693 N.E.2d at 195 (emphasis in the original). As the New York Court of Appeals further emphasized in upholding the convictions, "the gunfight in this case only began after defendants acknowledged and accepted each others' challenge to engage in a deadly battle on a public concourse." *Id.* Similarly, the Court of Appeals of Maryland has upheld a defendant's murder conviction based on his "tacit agreement" to participate in a gun battle even though he did not fire the fatal shot. *Alston,* 662 A.2d at 253. Nonetheless, I would not encourage adoption of "tacit agreement" language for jury instructions in this area. I agree with my colleagues' assessment that, when it is employed in this context, the terminology "is too amorphous and bereft of clear meaning to be practical for a jury instruction." *Ante* at 508. Better alternatives are available.