Opinion by
Associate Judge EASTERLY,
concurring in the judgment and joining in Parts I, III, and IV of the opinion for the court, at pages 1184.
Glickman, Associate Judge:
In Roy v. United States,[1] this court approved a jury instruction in a murder prosecution on the “gun battle” (or “urban gun battle”) theory of causation. The instruction permitted the jury to find that the defendant, by engaging in a gun battle in a public space, was responsible for causing the death of an innocent bystander killed by a stray bullet even if it was not the defendant who fired the fatal round. For the jury to come to that conclusion, the approved instruction required it to find, inter alia, that the bystander’s death was a “reasonably foreseeable” consequence of the defendant’s participation in the gun battle.[2]
*1178 The trial court gave a similar gun battle causation instruction in the present case, and the jury found appellant guilty of second-degree murder while armed,[3] But whereas the victim in Roy was an innocent bystander, in this case it was one of appellant’s antagonists in the shootout who was killed. The prosecution requested the instruction because evidence suggested that the fatal shot may have been fired not by appellant or one of his confederates, but by a confederate of the decedent. Appellant, who objected at trial, argues that a gun battle causation instruction is improper where the decedent was a participant in the battle rather than, as in Roy and other cases in which this court previously has encountered the instruction,[4] an innocent bystander. We disagree, however, and conclude that the trial court did not err in giving the gun battle instruction in this case.
Appellant also seeks a new trial on grounds of prosecutorial misconduct, but we conclude that the record does not support his claims of impropriety. We therefore uphold appellant’s convictions. However, as the government concedes, his three PFCV convictions merge, so we direct that two of those counts be vacated on remand.[5]
I.
Appellant was tried for the murder of Michael Jones in a gunfight that erupted on the night of July 7, 2012. The shooting was the culmination of events that began with a hostile confrontation earlier that evening between appellant and Michael Jones’s brother, Maurice Jones.
Maurice testified that at around 7:00 p.m. on July 7, he left his apartment at Eighth and R Street Northwest to walk to a nearby store. On the way there, Maurice encountered appellant, who was with two other men. Appellant taunted Maurice and struck him on the chin. Being outnumbered, Maurice retreated to his apartment.
About half an hour later, Maurice and his girlfriend, Kendra Wingate, heard banging on his front door and several voices outside. They ignored the banging and did not open the door. After the banging stopped, Maurice looked out and saw appellant waiting with two companions named ' Joseph Peoples and Rakeem McMillan. In order to confront them on even terms, Maurice phoned his brother Michael and á friend named Eric Cunningham and asked them to come to his apartment. While he waited for them, Maurice looked outside from time to time and observed appellant, Peoples, and McMillan gesture for him to come out. After a while, appellant and his companions departed.
Not long afterward, Michael Jones and Eric Cunningham arrived at Maurice’s apartment, together with a friend of Michael’s named James Hamlin. The four men then left on foot to look for appellant. About a block away, Maurice spotted Joseph Peoples rapidly descending an exteri- or stairway on the apartment building at 1730 Seventh Street known as Lincoln *1179 Tower. Ignoring Maurice’s hail, Peoples crossed Seventh Street to join Rakeem McMillan in front of a church; Moments later, according ■ to Maurice, Peoples turned and began shooting at him and his three companions as they arrived at Lincoln Tower.
Michael drew a gun and fired back at Peoples before he was killed by a bullet in the head. Although Maurice testified that no one else in his group was armed,' the parties at trial stipulated that Hamlin also fired a gun in response to the attack. The stipulation was corroborated by shell casings from two different weapons found in the vicinity of Michael’s body. This, in conjunction with inconclusive forensic evidence regarding Michael’s wound and the bullet recovered from his body, raised the possibility that Michael was killed by “friendly fire” from Hamlin.
Other shell casings recovered by police at the scene indicated that shots also were fired from a second-floor balcony of Lincoln Tower overlooking Seventh Street. Video surveillance footage obtained by the police from inside Lincoln Tower showed appellant on that balcony during the shooting.[6] The surveillance footage also appeared to show appellant retrieving what could have been a weapon from insidé the building and bringing it to the balcony just before the shooting started. Footage from just after the shooting showed appellant hurrying to the sixth floor and rendezvousing with Peoples, and Peoples receiving something from appellant that he then stashed in a stairwell. The police recovered firearms from that location. Relying on this evidence, the government contended at trial that appellant armed himself after seeing Maurice and company arrive at Lincoln Tower, shot at them from the balcony, and then, after Michael was down and the battle ended, handed his gun to Peoples, who hid it in the stairwell
Both appellant and Peoples were arrested later that night. They were indicted on one count of first-degree murder while armed, three counts of assault with intent to kill while armed, and related charges. The two were tried together.[7] At the close of the prosecution’s ease-in-chief, the trial court granted the government’s motion to dismiss the first-degree murder counts and to proceed instead on the lesser-included offense of second-degree murder while armed. While the jury found appellant guilty of that offense (along with two counts of assault with intent to kill while armed and the related weapons offenses), it acquitted Peoples of the homicide.[8]
II.
Appellant argues that the trial court erred as a matter of law by giving a gun battle causation instruction where the. victim was not a mere bystander but rather was an active participant in the battle. Our review of this contention is de novo, requiring us to determine whether the instruction is a correct and adequate statement of the law.[9]
The gun battle causation instruction this court approved in Roy reflected the fact that the murder victim in that case was a *1180 bystander; it required the jury to determine, inter alia, whether “it .was reasonably foreseeable that death or serious bodily injury to innocent bystanders could occur as a result of the defendant’s conduct” in engaging in a gun battle.[10] In this case, where the victim was not a bystander, the trial court omitted the reference to innocent bystanders and required the jury to determine whether “it was reasonably foreseeable that death or serious bodily injury [] .could occur as a result of the defendant’s conduct during the gun battle.” [11] The instruction was given to clarify that appellant could be liable for killing Michael Jones even if, as evidence suggested, the fatal shot might have been fired by Hamlin rather - than by appellant or his accomplice.
We conclude that the trial court’s modified gun battle causation instruction was legally sound. As stated in Roy, “[i]n this jurisdiction we have held findings of homicide liability permissible where: (1) a defendant’s actions contribute substantially to or are a substantial factor in a fatal injury ... and (2) the death is a reasonably foreseeable consequence of the defendant’s actions.”[12] The gun battle instruction applies these principles of proximate causation to the realities of urban warfare, in which the antagonists are collectively responsible for creating a zone of great danger — including a substantial likelihood that errant bullets will hit unintended targets.[13] It is true that Roy focused on the “highly increased risk to noncombatants” in particular and reasoned that “[i]t is this increased risk to innocent bystanders which justifies the application of proximate cause liability to those participants who willfully choose to engage in these battles.” [14] But the combatants themselves are obviously at great risk as well, and it surely is no less foreseeable that a stray bullet fired in the heat of a. gun battle will unintentionally hit an ally or confederate in the fight rather than someone outside it. For the purposes of applying principles of proximate causation, it thus makes no meaningful difference whether the reasonably foreseeable victim of a shootout was a participant in the battle or a bystander. In either casfe, all those who intentionally carried on the gun battle and thereby shared *1181 in creating the danger may be found to have substantially contributed to the ensuing fatality. . ■
The evidence at trial in this case permitted the jury to find that appellant proximately caused the death of Michael Jones, either by shooting Jones himself or by instigating and participating in a shootout in which one of the other combatants shot Jones, intentionally or ■ otherwise. Accordingly, we hold that the trial court did not err in giving the gun battle causation instruction.
Ill,
Appellant also claims that he was denied a fair trial as a result of “repeated prose-cutorial improprieties” to which he made timely objection. He identifies the improprieties as (1) asking a witness if she was scared to testify; (2) vouching for Maurice Jones’s credibility and otherwise expressing personal opinions in closing and rebuttal argument; and (3) submitting a new exhibit after the trial concluded. Appellant argues that even though the trial court took corrective action in response to the prosecutor’s questions and comments, the court’s remedies were inadequate to dispel the cumulative prejudice to his defense.
In reviewing allegations of prose-cutorial misconduct at trial, we begin by determining whether the challenged conduct actually was improper.[15] If it was not, that ends our inquiry, and we have no occasion -to go on to evaluate the trial court’s' response and whether there was reversible error.[16]
In the present case, we do not reach the second step in the analysis, because we reject appellant’s claims of impropriety.
A. “Are you scared to be here today?”
The’first alleged impropriety occurred during the direct examination of Kendra Wingate, who was with Maurice Jones in his apartment on the evening of July 7. Appellant charges that “without explanation or factual basis, the prosecutor asked Wingate, ‘Are you scared to be here today?’ ”[17], Appellant argues that this question was improper and highly prejudicial, and that although the trial court sustained his objection, the damage had been done — “government counsel had succeeded in raising the concern about the witness’s fear of testifying.”[18]
We have recognized that questions to witnesses about their fear-of testifying may be prejudicial because “(1) they suggest to the jury a decision based on guilt by association; and (2) the evidence plays on the passions and fear of the jury, by suggesting that a threat exists against the witnesses.”[19] “If the trial court admits evidence of threats solely to go to the general credibility or bias of the witness-, such admission has been held to be an abuse of discretion.”[20] But we have recognized that *1182 there are situations in which such inquiries are probative and permissible. One such situation is where the inquiry may help “to explain the specific behavior of a witness, such as inconsistent statements, delay in testifying, or unusual courtroom demean- or.”[21] We have held that inquiries into a witness’s fear are not improper where they help to explain prior inconsistent testimony, the witness’s lack of memory about prior testimony, or her general reluctance to testify — especially where there are not less prejudicial means by which to explain the witness’s behavior.[22] In this case, Win-gate’s testimony and demeanor on the stand justified the inquiry.
Before asking Wingate whether she was scared to testify, the prosecutor asked her a series of questions about the events of the evening of July 7. When asked about the banging and voices she heard at the door, Wingate repeatedly claimed that she could not remember details such as how loud the voices were or whether they were male, or female. The prosecutor followed up, referencing her professed inability to remember such details during prior interviews with investigators and asking whether it was “true that [Wingate] did not remember ... or was it that [she] did not want to be here testifying?” Wingate first responded that she did not remember, but then changed course and stated that she “did not want to testify” but refused to say why not. Only after repeated attempts to cajole Wingate into explaining her contradictory testimony and her unwillingness to testify did government counsel ask whether she was “scared.” The court sustained a defense objection and appellant sought no additional remedy.
The government’s question was asked to ascertain the reason for the witness’s reluctance and refusal to give truthful, relevant testimony. Wingate had provided inconsistent explanations for her inability to recall salient facts about the evening of July 7, and even when pressed, she was unwilling to explain why she did not wish to testify. There is no indication that there existed any less prejudicial means of explaining Wingate’s recalcitrance. Because the government’s question was “meant to explain specific behavior of the witness while testifying,” we conclude that, while the court did not abuse its discretion in sustaining the objection to it, the inquiry was not improper.[23]
B. Vouching for a Witness’s Credibility and Expressing Personal Opinions as to the Facts.
Appellant further contends that in closing and rebuttal argument, the prosecutor improperly vouched for the veracity of the government’s key witness, Maurice Jones, and expressed personal opinions regarding the facts of the case. In particular, appellant complains that the prosecutor asked rhetorical questions implying belief in Jones’s credibility — e.g., “[d]o we really think he’s naming the wrong folks?” and “[d]o we really think he’s just making names up?” — and asserted that “[w]hat he’s telling you is what he can absolutely remember. He doesn’t embellish it.” Appellant also complains that, in discussing the evidence at trial, the prosecutor conveyed her personal opinions by asserting what “we know” and what was (or was not) “true” — as, for example, when the prosecu *1183 tor stated that “[w]e know someone was firing” from the second floor balcony.[24]
Prosecutorial vouching and other expressions of personal opinion are improper because they
can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant’s right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor’s opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government’s judgment rather than its own view of the evidence.[25]
Given this rationale, the condemnation of personal opinion requires us to focus carefully on the nature of the prosecutor’s remarks. Like other advocates, prosecutors may and should marshal the evidence properly admitted at trial and fairly argue its legitimate significance.[26] That goes for argument, grounded in the evidence, that the jury should (or should not) credit a witness’s testimony. “[T]he key inquiry is whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo. A comment will be within the acceptable range as long as it is in the general nature of argument, and not an outright expression of opinion.”[27]
Our examination of the record in this case satisfies us that government counsel’s challenged remarks were fair comments on the evidence admitted at trial, not improper expressions of personal opinion. Her rhetorical questions and remarks regarding Maurice Jones’s testimony did not constitute personal vouching for his credibility; they were asked in the context of argument drawing reasonable inferences as to why Maurice, whose credibility the defense had attacked, might not have remembered certain aspects of the gun battle. The comments did not suggest that the prosecutor had knowledge outside the evidence admitted at trial or invite the jury to trust the governmént’s judgment.[28] Similarly, whenever the prosecutor told the jury what “we know” or what was “true,” she referred to the evidence that made it so. For instance, when the prosecutor stated that “[w]e know someone was firing” from the second floor balcony, she completed the sentence by explaining that it was “because thére were shell casings left behind on that balcony — not one, not two, but three right on the balcony — and several more that matched it down below which is evidence of the fact that someone was *1184 standing there firing.” There was never “any suggestion that the prosecutor was in effect adding [her] own unsworn testimony to the evidence in the record.”[29] We conclude that the comments challenged by appellant were not improper.
C. The Tardy Offer of a New Government Exhibit.
Lastly, appellant argues that the government improperly waited until after closing arguments were concluded to move an important new exhibit, into evidence. This exhibit was a compilation on one disc of the several surveillance video clips that individually had been admitted into , evidence during the trial. The clips in the compilation .were not altered and nothing new was added, but appellant objected that he was unfairly surprised and should have been given the opportunity to challenge the compilation. The trial court, finding nothing unfair in the admission of a single disc that merely compiled the unaltered video evidence already admitted, overruled the objection.
We agree with the trial court,that there was no unfair surprise. While the compilation disc should have been moved into evidence earlier — like other exhibits, prior to the close of evidence, as is the normal procedure — it is an exaggeration to characterize the government’s tardy motion as misconduct. There is no indication that the prosecutor deliberately withheld the exhibit to gain a tactical advantage. We discern nothing improper or prejudicial about the late admission of a disc merely compiling in a convenient format the video evidence that was already properly before the jury. Appellant had a full and fair opportunity to challenge the admission of each video clip when it was offered during trial, to explore and elucidate its probative worth, and to assess and interpret it in closing argument. Even if appellant is right that the chronologically ordered compilation of the separate videos on one disc “provide[d] a narrative supportive of the government’s case,”[30] there was nothing misleading or otherwise unfair in that. As the trial court observed, the compilation was akin to a notebook of exhibits arranged in sequence, a completely appropriate practice. We reject appellant’s claim of prosecutorial misconduct.
IV.
For the foregoing reasons, we affirm appellant’s convictions for second-degree murder while armed and other crimes, and we remand the case for the trial court to vacate two of appellant’s three PFCV convictions on merger grounds.

So ordered.

. 871 A.2d 498 (D.C. 2005).

. Id. at 506-7 n,8; see also id. at 509 (explaining that "[w]hile the evidence was uncleár” as to which combatánt fired the fatal shot, "such a determination is unnecessary if both men prepared for and undertook to participate in the gun battle where it was clearly foreseeable that others would be endangered”).

.The jury also convicted appellant of two counts of assault with intent to kill while armed, one count of carrying a pistol outside the home or place of business, and three counts of possession of a firearm during a crime of violence ("PFCV”). All those charges arose from the same incident as the second-degree murder charge, but the gun battle causation instruction did not implicate them.

. See McCray v. United States, 133 A.3d 205, 223-26 (D.C. 2016); Blaine v. United States, 18 A.3d 766, 768 (D.C. 2011).

. See Matthews v. United States, 892 A.2d 1100, 1106 (D.C. 2006) ("Multiple PFCV convictions will merge ... if they arise out of a defendant’s uninterrupted possession of a single weapon during a single act of violence.”) (citing Nixon v. United States, 730 A.2d 145, 153 (D.C. 1999)).

. Maurice, who fled after .sustaining a gunshot wound in his chest, did not see appellant during the gunfight.

. Hamlin also was named in the indictment, but his case was severed before trial.

. Peoples was found guilty only of carrying a pistol outside the home or business and of tampering with physical evidence.

.See Brown v. United States, 139 A.3d 870, 875 (D.C. 2016) ("While we review for abuse of discretion a trial court’s assessment of whether a jury instruction is supported by the evidence, see Wheeler v. United States, 930 A.2d 232, 238 (D.C. 2007), we review de novo the content of the instructions actually given, see Wilson-Bey v. United States, 903 A.2d 818, 827 (D.C. 2006) (en banc)[.]”); see also Roy, 871 A.2d at 507.

. Roy, 871 A.2d at 507 n.8 (emphasis added).

. The full gun battle causation instruction in this case was as follows:
An element of second degree murder is that the defendant caused the death of Michael Jones. A person causes the death of another person if' his conduct is a substantial factor in bringing about the death and if it was reasonably foreseeable that the death or serious bodily injury could result from such conduct. It is not necessary for the government to prove that the defendant personally fired the fatal round in this case. Rather, if the government proves beyond a reasonable doubt: Number 1, the defendant was armed and prepared to engage in a gun battle. Number 2, he did, in fact, engage in a gun battle on July 7th, 2012 at approximately 10:30 p.m. Number 3, the defendant’s conduct ... was a substantial factor in the death of Michael Jones. Number 4, it was reasonably foreseeable that death or serious bodily injury ... could occur as a result of the defendant's conduct during the gun battle. And, Number 5, the defendant did not act in self-defense. If these circumstances are proved beyond a reasonable doubt, the defendant is deemed to have caused the death of Michael Jones.

. Roy, 871 A.2d at 507-08 (internai citations omitted).

. See id. at 507; see also id. at 511 (Glick-man, J., concurring in part and dissenting in part) (“Where two or more persons 'voluntarily and jointly created a zone of danger,’ it is fair to hold each one 'responsible for his own acts and the acts of the others' that ensued.”) (quoting People v. Russell, 91 N.Y.2d 280, 670 N.Y.S.2d 166, 693 N.E.2d 193, 195 (1998)).

. Id. at 507.

. See, e.g., Washington v. United States, 884 A.2d 1080, 1088 (D.C. 2005).

. If we find that the challenged conduct was impioper and that timely objection to it was made, we must determine whether the trial court erred in overruling or otherwise responding to the objection and, if so, whether the error was harmless, "In making that determination, we consider the gravity of the . impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government’s case.” Id. (internal quotation marks omitted). If there was no timely objection, on the other hand, then our review is only for plain error. Id.

. Br.- for Appellant at 15.

. Id.

. Ebron v. United States, 838 A.2d 1140, 1149 (D.C. 2003) (citation and internal quotation marks omitted); see also Gordon v. United States, 783 A.2d 575, 586 (D.C. 2001).

. Mercer v. United States, 724 A.2d 1176, 1184 (D.C. 1999).

. Gordon, 783 A.2d at 586 (quoting Mercer, 724 A.2d at 1184).

. See Mercer, 724 A.2d at 1187-90.

. See Mercer, 724 A.2d at 1190. We note also that appellant did not request further relief, such as a specific curative or limiting instruction, after the trial court sustained his objection to the prosecutor’s question. The trial court did not plainly err by not taking additional corrective action sua sponte to preclude any possibility of prejudice. See Allen v. United States, 649 A.2d 548, 555 (D.C. 1994).

. Although the trial court viewed the prosecutor's remarks as "rhetorical flourishes” rather than statements of personal opinion, it granted appellant’s request for a curative instruction. After the prosecutor’s closing and rebuttal, the court admonished the jurors to disregard anything they perceived to be the expression of personal opinion by counsel and to decide the case on the evidence alone.

. United States v. Young, 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); see also Mathis v. United States, 513 A.2d 1344, 1348 (D.C. 1986).

. See Dixon v. United States, 565 A.2d 72, 77 (D.C. 1989) ("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.”) (quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla. 1985)).

. Irick v. United States, 565 A.2d 26, 35 (D.C. 1989) (italics in the original).

. Cf. Mitchell v. United States, 569 A.2d 177, 184 (D.C. 1990) (holding that prosecutor’s characterization of two government witnesses as " 'truthtelling individual[s]' [was] very close to the personal expression that this court has condemned,” but "was a fair response” with respect to the witness whose credibility had been attacked by defense counsel).

. Irick, 565 A.2d at 36 (footnote omitted). Likewise, when government counsel argued what was “true” or not, she did so by reminding the jury of what evidence it had (or had not) seen, in order to rebut parts of the defense closing arguments.

. Br. for Appellant at 16.